All right, our last argument on the calendar today is, what have I done with it? That's Haley v. Teachers Insurance and Annuity. Thank you. Thank you. All right, it took a second to get settled. So it's Ms. Santos, is that right? Yes. Okay, so Ms. Santos, you have ten minutes, but you reserve three minutes for rebuttal. So that gives you seven out of the gate. We'll see how generous we feel as we go. Good morning, your honors, and may it please the court. I hope that you are as excited about ERISA as you are about insurance this morning. Well, that might be testing the limits of human and human. No, I think we like ERISA too, right? We're all fans of ERISA. Excellent, I'm Jeannie Santos and I represent the defendant appellant TIAA. This is an unusual case even for ERISA. Usually, ERISA class actions are brought by a class of participants in a single plan challenging their plan's fiduciary's decisions to make certain products or services available to the participants in that plan. Like the participant loan services at issue in this case. But here, a single participant in a single plan sued on behalf of thousands of plans she doesn't participate in. And while her lawsuit challenges the arrangements that each plan's fiduciaries had with TIAA to service the participant loan program for that particular plan. She sued the service provider that offered those services rather than the fiduciaries who chose them. We know what happened. So why don't you tell us, you've got a list of problems that you have with what the district court did. What's the biggest problem? So the biggest problem is that the court's analysis was generally untethered to what ERISA and the Department of Labor require courts and fiduciaries to look at when evaluating whether transactions like these are permissible. So the way ERISA is set up is that it doesn't give an up or down vote to particular products or services. It creates these exemptions that have different conditions that courts have to look at in deciding whether these types of product arrangements are lawful. And that fiduciaries have to look at when deciding whether to offer them. And here, those exemptions, they're found in section 1108B1, B2- No, I think we get all that. So why is that a problem? Right, so not engaging with those exemptions and what they require is a problem because those are- What did the district court say about the exemptions? So the district court only really addressed one, section 1108B2. And I believe it was under the misimpression that affirmative defenses- What did it say about it? See, two things it said. It said the burden was on the other side. Exactly. The TIAA. Correct. Correctly. He did not address the exemptions. That's correct. So, and that I think is contrary to this court's decision. And Johnson maybe says to the contrary. Johnson may have, but certainly Myers versus Hurts Corporation is squarely held that you can't disregard affirmative defenses. And that's when you're considering commonality as well as predominance. Exactly, Your Honor. And affirmative defenses can, to be sure, sometimes maybe not pose a fatal commonality or a statute of limitations issue that only affects a few class members. But here, these exemptions are at the core of this case. And all of the exemptions that Congress and DOL created have plan-specific factors. But the clarification on these transactions absent the exemptions. Exactly, and let me give you- So the exemptions really are the determinant. Exactly, Your Honor. And one example of this is the B17 exemption. It turns under a racist text on whether planned fiduciaries made a good faith determination about the fair market value of the transaction. And so to adjudicate that, you would have to, at trial, march in 8,000 plans fiduciaries to talk about the investigation they undertook, whether it was in good faith, how they determined the fair market value of the transaction. Was this brought to the district court's attention? I mean, that this was an important element in the case? Absolutely, Your Honor. Our class certification briefing focused almost entirely on these exemptions, because they have always been at the core of what this case will turn on. We also addressed non-fiduciary liability, which my friends on the other side didn't address in their briefing before the district court. But absolutely, this was always the core of what the case was about. Remind me again what happened to the fiduciaries here. Were they sued? They were not sued. Those are separate cases. Yes, Your Honor. So Washington University's class of planned participants sued Washington University's fiduciaries. That claim was dismissed on the pleading stage, at the pleading stage. And then when the class settled, that lawsuit settled, the planned participants didn't require any changes to the participant loan program. And I think that really demonstrates why this is one of those kind of rare cases in which the 23B3 admonition that courts have to look at whether particular class members might have an interest in controlling the adjudication of their case really holds water. Because here we have really a test case of what happens when a particular class member here, the Wash U plan, brings a lawsuit. It controls its own litigation, it settled the case, and didn't require any changes to the loan program. So I mean, you could have brought in, I guess you still could if this goes forward, right? The fiduciaries, right? I don't think that would be possible, Your Honor, for a couple reasons. Number one, the Washington University planned fiduciaries were, any claims against them were released. And number two- I mean, for that particular plan, that might then be fatal. That might actually be dispositive with respect to your affirmative defense. But generally speaking, defendants such as your client would be able to implead and bring in the planned fiduciaries, right? So if there was a single plan class, I agree with Your Honor. But I think when the class is up to 8,000 plans, and for each of those plans, the non-fiduciary liability and adjudication of the affirmative defenses would all turn on plan-specific factors. It wouldn't be possible or manageable. I mean, it would be possible, it's hard to argue it would be superior as a way to do litigation. Certainly, it wouldn't be manageable, it wouldn't be superior, and the section B17 example I pointed to is one example. But I'll also point to B1, the section 1108B1 exemption. Whether the rate of interest is reasonable, according to the Department of Labor, turns on plan-specific factors, like whether that interest rate is similar relative to risk to alternative investments in the plan. And I'll note, before I give up my time for rebuttal, that when the Department of Labor promulgated this regulation, and you can see this at 54 Federal Register 520. It noted that commenters, a majority of commenters, had said, will you please just set a nationwide rate that we can all follow, or an index that we can all follow so we know it will be reasonable? And the Department of Labor said no. It said we think that the rate is going to vary plan to plan, and that plan fiduciaries have to consider regional factors and circumstances specific to the plan in evaluating whether that rate is reasonable. What about the rate of the offset, that particular interest component? I'm sorry, can you elaborate? I'm talking about the collateral payment that is used as credit.  Both are variable, right? Both interest rates? Yes, so the crediting rate ranged for different plans in different states, depending on some various factors from 3 to 6%. The loan interest rate varied from 3.5 to 8%. And so the level of compensation, the interest rate, all of those things varied plan by plan. And some of them might result in a higher rate for the crediting than for the plan itself, for the loan. So there was evidence of about, yes, there was evidence for about 1,600 plans that that was the case, yes, your honor. And even if that were not the case, the fact that the interest might have been higher for some plans than others, or the delta might have been greater than some plans, yes. Who should decide the question of whether these defenses create issues that do not survive the predominant inquiry? So in the sense, I mean, one option would be, it goes back to the district court to actually do what maybe he should have done in terms of addressing the exemptions. And the other is, and you may be arguing, it's evident on its face, we can do that. Yes. But there have been no findings by the district court in this area. That's correct. I think this is a case in which reversal rather than merely vacature is appropriate, and let me give you two reasons why, your honor. Number one, because I think this case follows in cases like Henry IPO and Johnson versus Nextel, where it is apparent from the plain text of the legal standard that governs that all of these inquiries are going to be plan specific, because that's what DOL has said. And so- Yeah, but plan specific doesn't tell us about the plans. We don't have any evidence of what the plans are here. We just have the one plan for Wash U. That's true, your honor. But what the Department of Labor has said about each of these exemptions is that they turn on factors that may vary with respect to each plan. So I don't think, and if my friends on the other side, for example, had presented any evidence that fiduciaries nationwide would consider a 3 to 6% interest rate to be unreasonable in all regions and under all circumstances, then perhaps it might make sense to send this back down to the district court. But you're also not, I mean, the burden's on you. So, and you haven't put in any evidence to show that these plans, you're just saying they are, they're variable. But there's no evidence before the district court about these other plans. That's incorrect, your honor. We submitted an expert report that exhaustively went through the variation in different plans. So if you look, for example, on page 607 of the joint appendix, it sets forth, yes. So I'm happy to reserve the remainder of my time unless you prefer a more extensive answer. Well, can we use a little of the- Of course, of course. See what a light touch I am, of course. With respect to the B17 exemption, which rule 23 factor was missing in your view? So I believe it would be both commonality and predominance, your honor. All right, let's stay with commonality for a minute. Did the district court find that there were other factors that satisfied the commonality requirement? As to that particular claim, the district court didn't analyze it. It- No, not the B17. Were there other issues that the court thought satisfied the commonality requirement? So the district court did say commonality was satisfied, but I think that that determination was erroneous. Because it was based on the mere existence of what it viewed as a common policy or a common program. And what Wal-Mart versus Dukes and Ingrid Petrobras all say is that just having a common program isn't enough to satisfy commonality. The threshold is lower, right? The threshold is lower, yes, but it doesn't just look- If we thought the court was right as to the commonality factor the court relied on, does the issue then become just predominance? Yes, then it would be a predominance issue, your honor. And like in- And as to predominance, is this case appropriate for subclasses in order to put into subclasses those situations where predominance is satisfied? No, your honor, because for each of the claims and each of the exemptions, there would be wide variation both among the facts on the ground, like the interest rates and the collateral rates, and there would be plan-specific evaluations. Well, I mean, what about just a subclass that consisted of the Wash U plan? So would that meet the other criteria for Rule 23? Well, let me first say that my friends on the other side have never sought any of our class, but I won't waste your time with forfeiture. Well, that's not surprising. A lot of people who go for a class want one big class. And if they end up with a little suggestion that they get cut classes, I've never seen them come back and say you made a big mistake, your honor, we should have lost on the total class claim. They're very glad to get half a load, in my experience. Yes, your honor, if this court believes that a nationwide class of up to 8,000 plans is improper, then I think the right course would be to vacate with instructions to decertify. And at that point, the plaintiff that would be left would be Ms. Haley, suing on behalf of the Wash U plan. And then there would be questions about how Ms. Haley's claims would be adjudicated, whether she has standing, whether there are additional defenses against her, like the fact that she has taken out two more collateralized loans since this litigation began. But that wouldn't be a matter of subclassing, I think it would just be a matter of her claim. Why is it all or nothing, if the class determination is erroneous for failure to give adequate consideration to either subclasses or to some of the factors, why can't it go back for that? Why does it have to go back without any consideration of any class issues? Well, I certainly will not fight vacature, your honor. But what I will say is that if this court vacates the district court's decision, we ask that at least it provide guidance like this court gave in Glatt versus Fox Searchlight and in Ray Petrobras, that these exemptions do turn on plan specific factors. But that's different than saying if it goes back, you can only look at her claim. That's what you started to say a minute ago. That would be my first order of request, but we would be happy with a vacature, but with some guidance on how these types of claims can be adjudicated. Because I do think, your honor, that there's really widespread lack of certainty among litigants and among courts about how these exemptions work and how non-fiduciary liability works. How, I know your time is over, but the day is young. I'll talk about it all day long, your honor. I won't argue with you on that one. So, what are the plan specific factors that you're relying on here? The contract, the terms of the particular plans. So there are two, one factual component and one legal component about plan specific factors. On the factual component, I would say the interest rates borne by the loans ranged from 3 to 6%. And you can see this on JA 548 to 549. Compensation ranged, and you can see this on JA 550. For some plans, TIAA received less than $10 per loan in compensation. For 38% of plans, it was between $10 and $50. For 30% of plans, it was between $50 and $100, and so on. So there are those factual distinctions. And then other plan level distinctions are legal in nature. So for example, the Department of Labor has told fiduciaries and courts that when evaluating reasonableness, they have to take into account, under 1108B2, for example. They have to take into account alternative options available to that particular plan. And so that will vary plan by plan, because the alternative options available to Washington University, with tens of thousands of participants, will be different than the alternatives available to a small non-profit, that TIAA services, that has 50 participants and less market power. What about the adequacy of consideration for the transfer of the assets? That has to be determined in good faith by the fiduciaries. Isn't that a, that's one, it's a B-17 exemption. And that requires, presumably, depositions of fiduciaries. That's right, your honor. Depositions and testimony from fiduciaries. And if my friend on the other side had submitted evidence, for example, that there is a nationwide fiduciary process that fiduciaries undertake when conducting a B-17 investigation, then I might agree with him that this could be adjudicated on a class-wide basis. But there's nothing like that, and he provided no evidence in the record to support that type of class-wide resolution. And this court's decision in Henry versus Champlain Enterprises made clear that that determination doesn't focus on the results, what the number is reached, but rather on the process the fiduciaries conducted. All right, why don't we stop there. Thank you, your honor. We'll, you have still three minutes for rebuttal, so we may hear more. But Mr. Collins, you've got ten minutes or more if we need it. Thank you, your honor. May it please the court, Todd Collins for appellee, Ms. Haley. Let's start first, if we may, with what every single plan had in common, which the district court found, and which swamped any differences that my distinguished opponents might gin up. What's at issue here? Are you here to focus on predominance now, or commonality? Well, if I may, common elements that are so strong and substantial that they make for predominance because there are so many of them. Judge Walker, in the Glatt case, which Tia relied upon in their reply, wrote, and I'll be quick with this. This is 811 F3rd at 538. The predominance requirement is satisfied if resolution of some of the factual or legal questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof. And if these particular issues are more substantial than the issues subject only to individualized proof. Now, Judge Walker was quoting from the food service decision, which was another case that Tia relied on. Well, there are two things. First of all, Judge Walker is fallible. Second is that, the second is that these cases depend on their own circumstances. I mean, here, the exemptions were out there, and that seems to be where the, you say they don't apply, but if they do apply, then the question really is, wasn't that important for the district court to examine how the exemptions played out here, and whether the issues factual and legal that arise from those exemptions, what they were. And then secondly, whether they were overwhelmed by the commonality. The exemptions, let's look at the exemptions for a moment. And if we may- What you're asking us to do is look at the exemptions, even though the district court did not. Well, the district court addressed the issue. It was aware of the adequate consideration element of B17. Yeah, aware of it, but all that I can understand that the district court did was it said, the burden is on TIAA to prove the exemptions. Right. And he was looking at this as if it was sort of a prime case kind of situation. With the affirmative defenses to be taken up later on and not really of concern to him at this stage. Well, your honor, the district court had a lot to deal with. The district court did focus- There may have been reasons why he did it. Yes, quite. But the district court had a lot to deal with. It did focus on all of the common factors. Which I won't bore the court with each and every one of them because we put that extensively in our brief. But the district court was quite correct to find that the exemptions are no reason to avoid certification in this case. Both because of the fact that they are affirmative defenses and also because there are common issues. For example, if I may, B-17, which my distinguished opponent referred to, Judge Sotomayor, formerly of this court as you know, wrote in another case on which TIAA relied in its reply. Champlain, Henry V Champlain Enterprises. She talked about a 1988 DOL proposed regulation relating to B-17. The proposed regulation read that with respect to the definition or determination of adequate consideration, and this is Judge Sotomayor quoting from the regulation.  First, the assigned value to an asset must reflect its fair market value. Second, the value assigned to an asset must be the product of determination by the fiduciary. And then the regulation goes on, only if both of these requirements are satisfied does the exemption apply. An exemption, as this court well knows, has to be satisfied as to each and every element. This proposed regulation for B-17 said, yes, you need a fiduciary determination. And yes, in this case, there would be a fiduciary determination with respect to 8,000 different plans. But there's something else. The something else is the value assigned to the asset must reflect its fair market value. In other words, that's a single determination to the extent that we are dealing here with a collateralized loan program that, among other factors, always pays more to TIA with respect to loan interest than it pays to the planned participants with respect to the interest on the collateral that they have been required to put into the TIAA traditional account. With the exception of 1,600 of them. Yes, and so, your honor, I guess a practical solution for that- My point is, these are all fiduciary suits. They're suits against fiduciaries. I don't know of a suit. Do you know of a suit that is against a non-fiduciary service provider? Such as the one you brought here? Yeah. You'd think that fiduciaries would be named as parties here, because they're an easy target. But also, they are the ones, the crux of this, if the fiduciaries are behaving properly. If the fiduciaries are behaving properly here, and that is what the service provider understands that they're doing, then it seems to me that there may be no suit here. Well, your honor, if I may, can I just say one more word about the Henry case, and then address your question? I just wanted to say that Judge Sotomayor went on to say that the proposed regulation that I just read had no legal effect, but that numerous circuit courts have adopted the DOL's proposed definition of adequate consideration. Forgive me, your honor. Your honor, it is a very rare situation. I was involved in one case where a class was certified against a service provider on a class of plans basis. Glass Dimensions v. State Street a few years ago in the District of Massachusetts. But it is rare, your honor, and it is rare because each individual plan is run by fiduciaries who have the highest duty known to law in connection with that plan. And it's highly unusual for one plan to be faced with exactly the same situation as the next plan. This is that unusual case. Because if you- It's a lot easier to sue TIAA than to sue all these fiduciaries. Yes, and one of the elements, of course, your honor, of B1 is who gets the benefit? Because if the benefit is not primary and exclusive on behalf of the plan and the plan participants, then in that event, the exemption does not apply. Remember, the exemption, whether it's B1 or it's B17, has a number of different elements. If even one element isn't satisfied, no exemption. So here- The judge made no finding on that. I'm sorry, your honor? The district judge here made no finding that these exemptions didn't apply. What the district judge did was to address the fact that there are all of these similar, identical aspects, one plan to the next. And that- May well be there's commonality, but not predominance. I mean, they're two different questions. Commonality is an easier threshold. Yeah, it is an easier threshold. But your honor, here, the facts are overwhelming with regard to commonality. And they, one on top of the next. Well, you say they're overwhelming, and they may be strong. It may be a strong showing of commonality. But how can they overwhelm such that there's predominance if the facts on the exemptions were not all thoroughly analyzed? Your honor, we- You may be right that after that analysis, they still predominate. But how can you know they predominate until you look at what's on the other side? Your honor, this court, of course, has power to move in several different directions. It could be that the district court got it wrong, but could have provided further reasoning. It could be that the district court got it exactly right, but one could question some of the reasoning. In this case, there are so many facts that are common that- That this can't be overwhelming no matter what's on the other, no matter what's on the other side. Your honor, there's practically nothing on the other side. Well, wait a minute, let's talk about some of the things that your adversary talked about in her brief. So- Please. She said you have to look at, among other things, the state of residence of the person who took the loan, the type and size of the loan, the interest rate at the time the loan was outstanding, the date it was taken out, the duration of the loan, specific requirements of the plan, liquidity restrictions inherent, aren't those all different? Well, sure, but I think whether the dog is five feet tall or four feet tall, he's still a dog. And here, what's important is all of the things that the plans have in common. For example, your honor, every plan, except for this 1,600 and those 1,600 loans out of, what, four 800,000 loans could be out of the class. Every loan involved more money in the loan than the loan participant. In every case, the collateral was required to be placed in the general account of TIA. One other thing, your honor- I have a question on that score. Please. TIA was not charging a fee here, right? A separate, independent fee. This was their compensation. Well, their compensation included the excess of loan interest over collateral interest. It also included, and the parties dispute this- You're saying the return on investment. The return on investment of the assets. They could go out and use the assets to try and make money. I'm sorry, your honor. Forgive me if I misspoke. I am not saying that. I am saying two things. What I intended to say a moment ago, forgive me if I got it wrong, no, no. Is that it is for all 400,000 loans except for 1,600, the interest, the loan interest was more than the collateral interest. That's one. Two, and as to this, there has been a dispute with the other side in their reply brief. Two, in addition to making money off that spread, in addition to that, TIA also made money because the collateral invested in the general account made more than what was paid out in collateral interest to the plan participants. We know this from Strombaum paragraph 42, A548, which said for almost all the loans, the crediting rate was 3.0 to 4.5. And then the same declaration also from Mr. Strombaum, the expert for defendants, paragraph 101, A574, the general account return during the relevant period was higher, 4.62 to 5.26%. So therefore, although TIA does not admit this, we must presume that TIA didn't tell anyone this since TIA has told this court it wasn't so. We must assume that the fiduciaries who came to a conclusion about adequate consideration or reasonable rate of interest didn't know this. And what they didn't know was that TIA was making money not only on what they call the spread, but in addition to that, they were making money because for the benefit of TIA, not for the benefit of the beneficiary. Now, what's the evidence we have of the fiduciary's knowledge on that score? Your Honor, I'm sorry, could you say that again? What is the evidence that we have of the fiduciary's lack of knowledge that you just portrayed? What's the evidence in the record? What we know of, Your Honor, is the absence of anything in the record indicating that TIA informed the fiduciaries for the 8,000 plans that in addition to its composition. You don't have any evidence from the fiduciaries themselves as to what they knew. And that's what's missing here. If I may, Your Honor. I'm sorry, Your Honor. No, go ahead. No, I'm sorry. Your Honor, we don't need it. We don't need it because at one point in the course of briefing before the district court, TIA took the position that it was necessary for there to be knowledge on the part of the fiduciary that the transaction was illegal. And that under the Harris case, as the court is well aware, is not the law. And it was that representation by TIA, which the district court quoted in its opinion, which referred to two elements, forgive me, two elements, I think it was three and five, present a difficult case. Or plaintiffs haven't explained how that can be resolved. But in fact, all the fiduciary needs under the prohibited transaction provisions, all that the fiduciary needs is to be aware of the fact that the plan has approved the collateralized loan program, which obviously they did. Well, I mean, the collateralized program has certain, and the interest rates and the comparison between the two rates plus any return on investment on the use of the collateral by TIA. Those are facts, too, that may or may not be illegal. But it doesn't matter, because you're right on the law that the court got it wrong and also that Haley got it, misstated it. But still, that's part of the factual, the knowledge of the fiduciary. And so, the extent to which the fiduciary acted in good faith is critical to the case, isn't it? And what they knew, and whether they were informed or not. You're hypothesizing that they weren't informed of a return on investment, but we don't have a record of it. Your Honor, it is not a leap. It is a reasonable assumption that the fiduciaries understood that they were authorizing for their plan participants the collateralized loan program. And that under 408, under 406 A1B and D is all that's required. That's it. So we don't need to devote resources to find out what the various different plan fiduciaries understood, apart from the fact that they understood that they were saying yes to the collateralized loan program. That's it. Is it your point that the commonality of this as to the spread, the fact of the spread, is sufficient and that any other, any variations as to rates is a matter of injury to be determined far down the road? Yes. Thank you, Your Honor. Can I, I'm over time and I apologize. Can I just add one more fact? Very briefly, yeah. Thank you very much. I mentioned that with regard to 408B17, it is not up to the fiduciaries. You need to make it a, as an objective matter, it needs to be fair market value, adequate consideration. The same applies to 408B1 with regard to the reasonable rate of interest. There are three examples that are provided in the DOL regulation 2550.408B1 with regard to reasonable rate of interest. With regard to each one of those examples provided by DOL, the fiduciary determined that the rate was reasonable, but DOL said in these examples, no. The exemption does not apply, despite the fiduciary determination. So therefore, it's a reasonableness standard, which is the same for all plans. Thank you. All right, thank you. We'll hear Ms. Santos for three minutes, everyone. Thank you, Your Honor. I'd like to try to make four points. Number one, I find it a little bit flummoxing that my friend on the other side focused most of his argument on the reasonableness of TIAA's compensation. When he abandoned, he is not challenged on appeal, and he expressly says this in a footnote in his brief, that he is not challenging on appeal, our appeal, based on this reasonableness of compensation. You went in the complaint and dropped it. I'm sorry? It was in the complaint. No, Your Honor, it stayed in the complaint. I believe the reason why my friend- I'm saying, I'm agreeing with you. Sorry. I'm throwing you a softball. Sorry, Your Honor. It was in the case, but now it's not. Yes, and the reason why I think my friend abandoned that particular argument on appeal is that the district court's subsequent summary judgment decision held that TIAA's compensation was across the board reasonable for all plans. And even if it were the case that we were looking at compensation, really all he said is that TIAA earned some compensation that was greater than zero, and you'd still have to examine whether it was reasonable under the plan's specific factors. Number two- Yes. The biggest thrust of his case is that I think is that there's a per se problem under the provision, without looking at the exemptions, because TIAA was a party in interest, right? And he's saying that the exemptions either don't apply, he's trying to give some reasons why they don't apply, or that if they do apply, whatever those facts are, are overwhelmed by the commonality. Yeah, and let me say two things to that, Your Honor. Number one is the district court already rejected at the motion to dismiss stage this kind of structural argument that the loans would be, that the services would be per se a non-exempt prohibited transaction, and you can see that on JA87, I believe. And number two, Your Honor, even if, it is true that basically every transaction between a plan and a service provider falls within the prohibited transaction provisions. Because what Congress did, and this is talked about in the final rule, the participant loan reg, is Congress, and also in Henry versus Champlain Enterprises, Justice Sotomayor, then Judge Sotomayor, said, listen, Congress created this system where basically everything's going to be prohibited. But at the same time, it enacted these exemptions with conditions that would allow plans and plan fiduciaries to engage in these types of transactions because they could help participants. The third point I wanted to make, because I think it's a really important one about non-fiduciary liability. Even aside from fiduciary knowledge, I think the critical factual question on trial here would be non-fiduciary liability, because the Supreme Court said in Harris Trust, and the district court said in, I think it was at JA76, that non-fiduciary liability will depend on whether the non-fiduciary had knowledge of the factual circumstances that rendered the transaction unlawful. And so that means the non-fiduciaries had to have knowledge of the facts and circumstances relevant to the exemptions, because that's what rendered these transactions lawful or not. I have another question. Can you have non-fiduciary liability without establishing fiduciary liability? No, your honor, there's no such thing as a non-fiduciary liability claim. It's only essentially an aiding and abetting a primary violation. Aiding and abetting. And so you have to have at least the same knowledge that the fiduciary had, or lack of knowledge. Yes, you'd have to have more knowledge, because I think what Harris Trust acknowledged is that non-fiduciaries aren't subject to the exact same standard. So they have to have knowledge of the facts and circumstances relevant to lawfulness, whereas fiduciary knowledge is governed by the text of 1106. And the text of 1106 says that the fiduciaries have to have knowledge that these transactions fall within one of the listed transactions. But the non-fiduciary knowledge is a little different. Does this mean that a trial, in order for him to prevail, or in order for Haley to prevail, she's got to prove the fiduciary's liability in each case? Yes, your honor, that's correct. You had two other points, I think, right? I'm sorry? You said you had four points. I did. Thank you for indulging me. I'll handle the last two quickly. On the benefit language that my friend pointed to in section 1108B1, I just want to make clear that that is not a common issue. That is yet another plan-specific issue, because what that language points to, and you can see this in the final rule, is the Department of Labor was trying to prevent a situation in which employers could indirectly pillage pension plans by, on the one hand, allowing loans, but then requiring employees who took out loans to basically hand the money back over to employers. So all of the examples of things that would fail this language involve some type of condition that the fiduciaries placed on the taking out of the loan. They're not looking at why service providers or how service providers designed their product. And finally, I want to just emphasize that at every point in which Ms. Haley is complaining about, every single plan had the option between a TIAA collateralized and non-collateralized loans. They chose the collateralized loans because considering all the factors that Congress and DOL told them to consider, they deemed these more appropriate and more useful and more beneficial to their participants. And it would be those decisions that would be on trial. Thank you, your honors. All right, well, thank you both. We will reserve decision. That concludes the arguments for today. We have one other case that is on submission. Before we adjourn, let me just thank the courtroom deputy, Ms. Beard, and all the folks who make this court operate so smoothly. We're really, really fortunate. So it's good to have everybody back, albeit with masks, and I hope we'll see you soon. Have a good day. We're adjourned. Court stands adjourned.